733 P.2d 1120

**CONTINENTAL TOWNHOUSES EAST UNIT ONE ASSOCIATION, an Arizona corporation; Vincent Territo; Dorothea Waxman; and Jill Sampson, Plaintiffs-Appellees, Cross Appellants,**

v.

**Roy R. BROCKBANK and Rita Brockbank, husband and wife, d/b/a Roy Brockbank Enterprises, Defendants-Appellants, Cross Appellees.**

No. 1 CA–CIV 8582.

Court of Appeals of Arizona, Division 1, Department C.

Aug. 5, 1986.

Reconsideration Denied Dec. 5, 1986.

Review Denied March 11, 1987.

---

4. I agree with the majority that the test set out in *State v. Lukens* was violated in this case.

Wade Church, P.C. by Wade Church, Phoenix, for defendants-appellants, cross appellees.

Beus, Gilbert, Wake & Morrill by Neil Vincent Wake, Joseph A. Schenk, Shawn K. Aiken, Phoenix, for plaintiffs-appellees, cross appellants.

## OPINION

CONTRERAS, Presiding Judge.

This appeal and cross-appeal followed the trial court's remittitur of damages awarded by a jury for the defendant-appellant's breach of the implied warranty of workmanship and habitability in the construction of the plaintiffs-appellees' townhouse roofs. Among the issues we resolve on appeal is whether an award of attorneys' fees under A.R.S. § 12–341.01 may include the cost of legal services performed by legal assistants. We conclude that the cost of such services may be included.

## I. BACKGROUND OF THE CASE

Continental Townhouses East Unit One Association (the "Association") filed a complaint on December 16, 1981, against Roy Brockbank, the builder and seller of approximately 40% of the units in the Continental Townhouses condominium development in Mesa, Arizona. The complaint alleged that Brockbank had breached the implied warranty of workmanlike construction in building the condominium roofs. The complaint also alleged that Brockbank had breached his agreement to construct and repair various amenities and facilities within the development's common areas.

Nearly two years later, the trial court ordered that the individual homeowners, rather than the Association, were the real parties in interest. The court's minute entry referred to the Association's Covenants, Conditions and Restrictions, which provided that the homeowners pay the Association an assessment for improvement and maintenance of the homes, and concluded that "though Plaintiff [Association] has a duty to maintain and repair the roofs of the homeowners, the expense of such maintenance and repair is actually born [sic] by the homeowners through the assessment." The court also noted that recovery by the Association might not protect

Brockbank from further suits by individual homeowners, and that privity between the Association and Brockbank, required at the time under Arizona law, was lacking.[1] Thus, the court dismissed the complaint "as to those items in controversy which are not part of the 'Common Area' under the management and control of the Plaintiff Association," but "without prejudice in that a new Complaint may be filed by the individual homeowners."

An amended complaint was filed the following month, and in August, 1984, plaintiffs' Motion for Class Certification was granted. The certified class was defined as "any past, present, or future members of the plaintiff association who have paid, who will pay, or who are obligated to pay for any repairs to roofs for which defendants are found liable...." The plaintiff representatives of the class were townhouse owners and Association members; one of the class representatives owned a Brockbank-built unit.

On January 23, 1985, after a six day trial, a jury awarded the plaintiff-class $312,454.91 on the roof damage claim and $17,047.91 to the Association on the common areas claim.

In March of 1985, the trial judge granted Brockbank's motion for remittitur on the roof claim, reducing the amount of the jury verdict to $128,853.00, plus interest from June 2, 1981. Attorneys' fees were awarded to the Association on the common areas claim and to the class in a reduced amount on the roof damage claim. The class elected to accept the remittitur. Appellant Brockbank has not appealed from the judgment on the common areas claim or the award of attorneys' fees in favor of the Association. This appeal, therefore, concerns only the roof damage claim brought by the class and its award of attorneys' fees.

1. The trial court cited *Richards v. Powercraft Homes, Inc.,* 139 Ariz. 264, 678 P.2d 449 (App. 1983), as the basis for its conclusion on the privity issue. Subsequently, the Arizona Supreme Court reviewed *Richards* and held that privity is not required to maintain an action against the builder-vendor of a home for breach of the implied warranty of workmanship and habitability. *See Richards v. Powercraft Homes, Inc.,* 139 Ariz. 242, 678 P.2d 427 (1984).

The class cross-appeals from the trial court's grant of remittitur and denial of the full amount requested as attorneys' fees.

## II. ISSUES RAISED ON APPEAL BY BROCKBANK

### A. *Class Certification.*

Appellant argues that there was antagonism and a lack of common interest between the members of the class. Of the 221 class members, only 87 owned the allegedly defective Brockbank units, while the other 134 owned units with Continental roofs. According to appellant, those with Continental roofs resisted any increases in the homeowners' assessments to pay for repairs to the Brockbank units. In particular, appellant contends that Rule 23(a)(4), Arizona Rules of Civil Procedure, is not satisfied if Continental roof owners represent the class. Rule 23(a)(4) requires that "the representative parties will fairly and adequately protect the interests of the class."

We conclude that the Association's Covenants, Conditions and Restrictions require that all Association members be assessed for roof improvements; both Brockbank *and* Continental roof owners must contribute and both are financially damaged if assessments are used to pay for repairs of the Brockbank units. Thus, all members of the homeowner association had an interest in recovering the amount of damages from an "outside" party, namely Brockbank.

■ This court will not interfere with the decision of the trial court unless it abused its discretion in certifying this class and permitting the plaintiff homeowners to proceed as a class. *See Godbey v. Roosevelt School Dist. No. 66*, 131 Ariz. 13, 638 P.2d 235 (App.1981). Based on the responsibilities of the Association and the homeowners as specified in the Association's Covenants, Conditions and Restrictions, and as presented to the trial court, we perceive no abuse of discretion.

### B. *Pre-Judgment Interest.*

The remittitur submitted for plaintiffs-appellees' acceptance included an award of pre-judgment interest from June 2, 1981, to the date of entry of judgment.[2]

■ Both parties agree with the legal proposition that pre-judgment interest on a *liquidated* claim is a matter of right. *See, e.g., Autonumerics, Inc. v. Bayer Industries, Inc.*, 144 Ariz. 181, 193, 696 P.2d 1330, 1342 (App.1984); *Arizona Title Insurance and Trust Co. v. O'Malley Lumber Co.*, 14 Ariz.App. 486, 496, 484 P.2d 639, 649 (1971). If the claim is not liquidated, then an award of pre-judgment interest is not appropriate.

■ The parties dispute whether the damages in this case were of a liquidated or unliquidated nature. A claim is liquidated "where the evidence furnishes data, which, if believed, makes it possible to compute the amount with exactness, without reliance upon opinion or discretion." *Custom Roofing Co., Inc. v. Alling*, 146 Ariz. 388, 391, 706 P.2d 400, 403 (App.1985). After analyzing several leading Arizona cases which determined the liquidated or unliquidated nature of particular claims, we conclude that the appellees' claim in this case is unliquidated.[3] The amount of the home-

---

**2.** June 2, 1981 is the date of the $128,853.00 re-roofing bid submitted to the Association by Advance Roofing and Supply Company. The trial judge stated in his March 7, 1985 minute entry that "[a]ll of the 87 units could have been reconstructed in June, 1982, at a cost of $128,-853.00, which is the earliest date after the action was commenced that ... the roofs could have been reconstructed at a specific cost." The judge later corrected his reference to the date of the Advance Roofing bid. However, the bid was calculated and submitted before the action was commenced, contrary to the partially corrected minute entry.

**3.** *See, e.g., Custom Roofing Co., Inc. v. Alling,* 146 Ariz. 388, 706 P.2d 400 (App.1985) (labor costs under a construction contract were only an estimate which could sustain an award for damages but did not reach the level of exactitude required for an award of pre-judgment interest); *Northern Arizona Gas Service, Inc. v. Petrolane Transport, Inc.,* 145 Ariz. 467, 702 P.2d 696 (App.1984) (damages not liquidated because damage formula subject to discretion of the judge and possibly affected by mitigating acts of the non-breaching party); *Autonumerics, Inc. v. Bayer Industries, Inc.,* 144 Ariz. 181, 696 P.2d

owners' claim in this case was based on opinion testimony and discretionary judgments, and was affected by the homeowners' mitigating conduct. In short, the damage figure was in dispute at the commencement of the litigation and remains disputed at the present time. In fact, when the trial judge exercised his discretion to order a remittitur from the jury verdict, he returned the amount of the claim to an uncertain status pending appellees' acceptance of the remittitur order. *Cf. Borrow v. El Dorado Lodge,* 75 Ariz. 218, 254 P.2d 1027 (1953) (when the court denied a motion for a new trial, conditioned expressly upon a remitter of a substantial amount from the original verdict, the amount of the judgment remained unliquidated until the plaintiffs should exercise their option to make the remitter or subject themselves to a new trial).

We conclude that under the circumstances of this case, the award of pre-judgment interest in favor of appellees was improper.

### C. *Mitigation of Damages.*

The appellant argues that the class could have, but failed to, set up a structured program of roof maintenance in order to minimize its damages. Appellant contends that the roofs were inspected only at the time of their construction and received a "clean bill of health," and that a structured roof maintenance program was essential but could not be implemented because of the conflicting interests of the Continental and Brockbank roof owners. Appellant implies that the deterioration of the roofs was wholly caused by the failure of the homeowners to properly maintain them.

■ The class responds that the jury received a proper instruction on the doctrine of avoidable consequences. The instruction explained that the "defendant [appellant Brockbank] must prove by the preponderance of the evidence that a portion of plaintiffs' losses, if any, have occurred as a result of their failure to take reasonable steps to avoid those losses." Since the jury permitted the class to recover, the class now argues that appellant simply failed to meet its burden of proof. Additionally, substantial evidence existed for the jury to find that the class had reasonably maintained the roofs and mitigated its damages to the best of its ability given the condition of the roofs as constructed.[4] In sum, because the jury instruction was proper and evidence existed from which the jury could conclude that the homeowners acted reasonably to minimize their damages, we affirm the jury on this issue.

### D. *Other Jury Instructions.*

■ Appellant argues that he was entitled to a jury instruction stating that since his work passed the Mesa Minimum Workmanship Standards, it was good and workmanlike. Such an instruction was not, however, requested by appellant, and it would have been improper given the ample evidence that the roof construction was not workmanlike.

Appellant also contests the trial court's refusal to submit instruction #6 to the jury:

You are instructed that the Mesa Uniform Building Code in force at the time the townhouses were built sets the safety standards for the construction of the various building components of townhouses in the City of Mesa, and that compliance by a contractor with said standards discharges his obligation for the safety of the occupants. Source: *Mesa Uniform Building Code,* 1973.

1330 (App.1984) (calculation of lost profits not liquidated because based on opinion testimony and discretionary judgments).

4. The record includes evidence that the Association expended $80,000 on interim roof repairs, increasing the homeowners' assessments to the maximum extent permitted by the Covenants, Conditions and Restrictions as a consequence. Experts who testified at trial agreed that the condition of the Brockbank roofs only two years after construction could not have been salvaged by a normal maintenance program and that the roofs were not of good or workmanlike quality when they were built.

■ Both the instruction which appellant argues he was entitled to but did not request and instruction # 6 misstate the law. Appellant's compliance with the Mesa standards was only one of several elements which the jury could consider to determine workmanlike quality. A proper instruction was given to the jury based on *Richards v. Powercraft Homes, Inc.*, 139 Ariz. 242, 678 P.2d 427 (1984).[5]

The *Richards* case also resolves appellant's contention that the trial judge improperly rejected proffered instruction # 5:

> You are instructed that in determining whether or not there has been a defect in the design of a product, you may take into account both the state of the art and industry standards existing at the time and the requirements of the Uniform Building Code applicable at the time the allegedly defective design was made.

The source of instruction # 5 was *Deyoe v. Clark Equipment Co., Inc.*, 134 Ariz. 281, 655 P.2d 1333 (App.1982), a case which dealt with strict liability principles. This instruction was properly rejected because the immediate case involves workmanship and breach of the implied warranty of habitability, not strict liability concepts of design standards and state of the art.

In conclusion, of all the issues raised by appellant, we agree only that the award of pre-judgment interest to the class was improper.

## III. ISSUES RAISED ON CROSS-APPEAL BY THE CLASS

### A. *Remittitur.*

The trial judge granted the appellant's motion for remittitur and submitted the reduced figure of $128,853 to the class for its acceptance. The remittitur amount was derived from the Advance Roofing bid dated June 2, 1981, to re-roof the 87 units.

The trial judge explained his decision to remit the jury verdict in the March 7, 1985, minute entry:

> Owners of townhouses constructed by Defendants are entitled to the cost of installing a new roof at the time they discovered the roofs were defective. They are not entitled to the cost of repairs and in some cases, installation of new roofs at various times during the progress of the litigation, and in addition the cost of new roofs on all units in 1985, which would give them more than they bargained for. All of the 87 units could have been reconstructed in June, 1982, [date later corrected to 1981] at a cost of $128,853.00, which is the earliest date after the action was commenced that, under the evidence, the roofs could have been reconstructed at a specific cost.

The jury was, however, instructed only that

> If you decide for the plaintiff homeowners on the question of liability, you must then fix the amount of money that will reasonably compensate them for the damages proved by the evidence to have resulted from the defendants' conduct. In general, the measure of damages for a builder's failure to provide a good, workmanlike structure is the cost of repair.

The instruction did not specify the particular time from which damages were to be measured or that "cost of repair" could not be the cost of replacing the defective roofs. No requests for other instructions or objections to the damage instruction as given were made; appellant only objected after the trial that the jury verdict was excessive.

Based on the instruction given and the evidence presented at trial, the jury could properly reach its verdict of $312,454.91. Roofer Joseph Beuche estimated that the cost to repair all 87 units would be $231,594.00, and class representative Jill Samp-

---

**5.** The standard to be applied in determining whether defendant breached his promise to construct the plaintiffs' townhouses in a good and workmanlike fashion is one of reasonableness in light of surrounding circumstances. The age of the townhouses, the extent to which they have been maintained, and the use to which they have been put are some of the factors entering into this determination.

son testified that $79,742.91 had been spent by the homeowners for interim roof repairs.

■ The amount of a jury verdict should be reduced only for "the most cogent reasons." *Young Candy & Tobacco Co. v. Montoya*, 91 Ariz. 363, 372 P.2d 703 (1962). It has not been shown on appeal that the jury mistakenly applied the wrong principles in determining the damages or that the jury acted with improper motives or bias. *Id.* The jury was instructed properly on damages and the verdict was within the limits of the evidence. *See also Muccilli v. Huff's Boys' Store, Inc.*, 12 Ariz. App. 584, 473 P.2d 786 (1970). We conclude that it was erroneous for the trial judge to order a remittitur and therefore we reinstate the original jury verdict in the amount of $312,454.91.

B. *Attorneys' Fees.*

We address two important issues regarding the attorneys' fee award at issue in this case:

(1) Whether the value of legal work performed by legal assistants may be recovered as an element of attorneys' fees under A.R.S. § 12–341.01; and

(2) The effect of the original contingency fee contract between counsel and the Association on the recovery of fees by the class.

The class requested an award of attorneys' fees under A.R.S. § 12–341.01(A).[6] It sought 40% of the jury verdict, or $124,981.96, pursuant to a contingency fee agreement signed by counsel and the President of the Association, the original plaintiff in the litigation. Counsel for the class contends that the same contingency fee agreement was expected to apply between it and the class when the class replaced the Association as plaintiff.

The request for attorneys' fees included an itemization of hourly rates and time

expended by counsel and legal assistants, totalling $73,977.00. The trial court awarded the class $58,485.00, and later increased the award to $61,795.00. All amounts requested for the legal tasks performed by legal assistants and law clerks were denied by the trial court. The trial judge set forth his reason:

> Absent specific Arizona authority to the contrary, this Court will not award attorney fees for work performed by non-lawyers. The only authorities cited to the Court are United States District Court holdings which are divided on the issue.

Until now, Arizona courts have not directly ruled on the recoverability of fees for legal work performed by legal assistants and law clerks. See the discussion in Stahl and Smith, *Paralegal Services and Awards of Attorneys' Fees Under Arizona Law*, Ariz.B.J., Oct.-Nov. 1984, at 21.

Courts which have permitted paralegal services to be recovered as an element of attorneys' fees have recognized that doing so promotes lawyer efficiency and reduces client costs. The Ninth Circuit has permitted recovery of paralegal services as part of the recovery of attorneys' fees under the Longshoremen's and Harbor Workers' Compensation Act for the assistance rendered by a claimant's lay representative to the claimant's attorney:

> One of the necessary incidents of an attorney's fee is the attorney's maintaining of a competent staff to assist him.... Paralegals can do some of the work that the attorney would have to do anyway and can do it at substantially less cost per hour, resulting in less total cost billed....

*Todd Shipyards Corp. v. Director, Office of Workers' Compensation Programs*, 545 F.2d 1176, 1182 (9th Cir.1976).

---

6. A.R.S. § 12–341.01(A) provides in part that "[i]n any contested action arising out of a contract, express or implied, the court may award the successful party reasonable attorney's fees." A.R.S. § 12–341.01(B) adds, "The award of reasonable attorney's fees awarded pursuant to

subsection A should be made to mitigate the burden of the expense of litigation to establish a just claim or a just defense. It need not equal or relate to the attorney's fees actually paid or contracted, but such award may not exceed the amount paid or agreed to be paid."

The Arizona federal district court has agreed:

> Paralegal time has been included [in this case] as a part of the lodestar [fee] calculation rather than being allowed as costs ... I realize this is an issue as to which courts differ. The use of paralegals, if properly supervised and directed, can be cost effective. It is reasonable to recognize and encourage a continuation of paralegal usage in appropriate circumstances.

*State of Arizona v. Maricopa County Medical Society*, 578 F.Supp. 1262, 1270 (D.Ariz.1984). *See also Pacific Coast Agricultural Export Assoc. v. Sunkist Growers, Inc.*, 526 F.2d 1196, 1210 n. 19 (9th Cir.1975), *cert. denied*, 425 U.S. 959, 96 S.Ct. 1741, 48 L.Ed.2d 204 (1976).[7] The Arizona federal district court has also refused to authorize compensation for lawyers performing services that could have been performed by a legal assistant, as well as for excessive or duplicated time incurred by both lawyers and legal assistants on routine tasks. *Metro Data Systems, Inc. v. Durango Systems, Inc.*, 597 F.Supp. 244 (D.Ariz.1984).

■ We conclude that legal assistant and law clerk services may properly be included as elements in attorneys' fees applications and awards pursuant to A.R.S. § 12–341.01, both in the trial court and on appeal. The purpose of awards based on that statute is to "mitigate the burden of the expense of litigation." A.R.S. § 12–341.01(B). Properly employed and supervised legal assistants and law clerks[8] can decrease litigation expense and improve lawyers' efficiency.

Lawyers should not be required to perform tasks more properly performed by legal assistants or law clerks solely to permit that time to be compensable in the event an attorneys' fees application is ultimately submitted. Requiring such a misallocation of valuable resources would serve no useful purpose and would be contrary to the direction to interpret the Rules of Civil Procedure to serve the "just, speedy, and inexpensive determination of every action." Rule 1, Arizona Rules of Civil Procedure. Instead, proper use of legal assistants and law clerks should be encouraged to facilitate providing the most cost-effective legal services to the public. If compensation could not be obtained for legal assistant and law clerk services in appropriate cases, the fee-shifting objective of A.R.S. § 12–341.01 would also not be accomplished.

Use of legal assistants nationally has significantly increased in recent years. *See* Law Poll, 69 A.B.A.J. 1626 (1983); Ulrich, *Legal Assistants Can Increase Your Profits*, 69 A.B.A.J. 1634 (1983). Legal assistants are being employed increasingly both in Arizona and elsewhere, in many law practice categories, particularly in large firms. *See generally* Stahl and Smith, *supra;* National Law Journal, Sept. 30, 1985, at S4–S18; *Working with Legal Assistants, passim* (P. Ulrich and R. Mucklestone ed. 1980, 1981). Authoritative projections suggest the number of such positions will nearly double during the next years, from an estimated 53,000 in 1984 to 104,000 in 1995. U.S. Dept. of Labor, Bureau of Labor Statistics, *Occupational Outlook Quarterly*, at 19 (Spring 1986). Legal assistants have thus now become an essential element of legal services provided by many law offices. Lawyers have also employed law clerks for as long as there have been law students. They also can provide valuable assistance, particularly in legal research and preparing documents under the lawyer's supervision.

We do not believe such services should be considered part of taxable court "costs." They are instead properly considered as a component of attorneys' fees, since an attorney would have performed these services if a legal assistant was not employed instead. It also cannot be assumed legal assistant services are automatically includ-

---

7. Several other cases and relevant articles are cited in the Arizona Appellate Handbook, vol. 1, ch. 1, p. 2 (Supp.1986).

8. Lawyers' professional responsibilities regarding supervision of nonlawyer assistants are stated in Rule of Professional Conduct 5.3.

ed in lawyers' hourly billing rates as a standard law office operating expense. Instead, such services are often itemized and billed separately. Ulrich, *supra.* Moreover, lawyers should not be required to inflate their hourly rates to include legal assistant time as a general overhead component. Doing so would make fair allocation of the cost of such services impossible, since some clients and matters may require a much higher proportion of legal assistant and law clerk services than others.

The question then arises as to what categories of persons or tasks should be considered "legal assistant" for purposes of attorneys' fees applications.[9] In this regard, we believe the definition of "legal assistant" formulated by the American Bar Association's Standing Committee on Legal Assistants and approved as an official policy statement by its Board of Governors in February, 1986, is appropriate:

> A legal assistant is a person, qualified through education, training, or work experience, who is employed or retained by a lawyer, law office, governmental agency, or other entity in a capacity or function which involves the performance, under the ultimate direction and supervision of an attorney, of specifically-delegated substantive legal work, which work, for the most part, requires a sufficient knowledge of legal concepts that, absent such assistant, the attorney would perform the task.

Clearly, since the legal assistant must perform legal work and be supervised by an attorney, the fee application must contain enough details to demonstrate to the court that these requirements have been met, thereby comporting with the spirit of *Schweiger v. China Doll Restaurant, Inc.,* 138 Ariz. 183, 673 P.2d 927 (App.1983).

█ Finally, we reiterate and emphasize the discretionary power of the trial judge in awarding attorneys' fees under A.R.S. § 12–341.01. *See, e.g., Associated Indemnity Corp. v. Warner,* 143 Ariz. 567, 694 P.2d 1181 (1985); *Solar-West, Inc. v.*

*Falk,* 141 Ariz. 414, 687 P.2d 939 (App. 1984). The trial judge is not required to, but may, consider the value of services rendered in a case by legal assistants, law clerks, and paralegals, applying the same standards as are used in evaluating lawyers' time.

Not only must this case be remanded to give the trial judge the opportunity to consider inclusion of legal assistants' services in the attorneys' fee award, but further evidence must be considered in order to determine whether the contingency fee agreement between counsel and the Association applies in favor of the class.

In the retainer agreement, the client agreed to pay counsel 40% of the net amount recovered if the case was tried. The client in the agreement was Continental Townhouses East Unit One Association. The client on appeal is the class of homeowners, represented by three individual homeowners. It is not clear to this court following oral argument whether the signed retainer agreement was intended to apply between counsel and the current plaintiff. The trial court is in a better position to determine, perhaps by way of further proceedings, the understanding between the parties with regard to the contingency fee agreement, and therefore whether it would be appropriate to award attorneys' fees pursuant to the fee agreement.

Thus, we remand with the following directions.

1. The original jury verdict must be reinstated, without pre-judgment interest.

2. The court should consider evidence of the parties' understanding with counsel regarding the continued viability of the retainer agreement after the lawsuit was converted to a class action.

3. If the court is convinced that the 40% fee recovery under the retainer agreement applies between counsel and the class, it *may* award *up to* 40% of the verdict as

**9.** We use the terms legal assistant, paralegal, and law clerk interchangeably in this opinion, and believe the ABA definition encompasses each of these titles.

attorneys' fees.[10] The 40% figure operates as a ceiling on the amount of attorneys' fees that may be recovered; the court need not agree that 40% of the recovery is a reasonable sum for attorneys' fees in this case and may award less. In determining the amount to be awarded as attorneys' fees, the court may, in its discretion, consider and include the value of time spent by legal assistants on legal tasks. The hourly rate charged for time spent by legal assistants should reflect reasonable community standards of remuneration.

4. If the court determines that the retainer agreement was not intended to control the fee paid by the class, it may rely upon the itemized fee request submitted by counsel and also, in its discretion, consider the amounts requested for time spent on legal tasks by legal assistants.

Finally, the class requests an award of attorneys' fees on appeal pursuant to A.R.S. § 12–341.01. We grant the request. The class may establish the amount of its award by complying with Rule 21(c), Arizona Rules of Civil Appellate Procedure, and our decision in *Schweiger v. China Doll Restaurant, Inc.*, 138 Ariz. 183, 673 P.2d 927 (App.1983). In accordance with our decision today, the request for fees on appeal may include the value of legal work performed by legal assistants, if any.

The judgment of the trial court is affirmed in part, reversed in part and remanded with the foregoing directions.

GRANT, J., and ULRICH *, J. Pro Tem., concur.

---

10. Cross-appellant's argument in its brief that the court "may award fees in an amount even greater than a contingent fee agreement specifies" cannot be supported by the case cited for the proposition, which involved a distinctly different set of facts. (*Prendergast v. City of Tempe*, 143 Ariz. 14, 691 P.2d 726 (App.1984)).

* *NOTE:* The Honorable Paul G. Ulrich, Judge Pro Tempore has been authorized to participate in this matter by the Chief Justice of the Arizona Supreme Court, pursuant to Ariz. Const. art. VI, § 3 and A.R.S. §§ 12–145 and 12–147.