**MARVIN JOHNSON, P.C., a professional corporation; Lesher & Borodkin, P.C., a professional corporation; Zlaket & Zlaket, P.C., a professional corporation, Plaintiffs,**

**v.**

**Samuel W. SHOEN, M.D., an individual; Michael L. Shoen and Christa Shoen, husband and wife; Mary Anna Shoen–Eaton, an individual; Cecilia M. Shoen–Hanlon, an individual; Katrina M. Shoen–Carlson, an individual; and Leonard S. Shoen and Carol Shoen, husband and wife, Defendants.**

No. Civ. 92–0185 PHX.

United States District Court,
D. Arizona.

May 24, 1995.

Jones, Skelton & Hochuli by William R. Jones, Jr. and Robert B. Berk, Phoenix, AZ, for plaintiff.

Gil Shaw, Phoenix, AZ, for defendant.

## DECISION and ORDER

MYRON L. GORDON, District Judge.

On January 31, 1992, the plaintiffs filed a twelve-count complaint asserting claims based upon breach of contract and quantum meruit. Jurisdiction is based on 28 U.S.C. Sec. 1332. A seven-day jury trial was held beginning on January 17, 1995. Presently before the court are three post-trial motions: (1) "Defendants Samuel W. Shoen's, Michael L. Shoen's and Christa Shoen's, Mary Anna Shoen Eaton's, Katrina Shoen Carlson's, Cecilia Shoen Hanlon's, and L.S. Shoen's and Carol Shoen's Motion for a New Trial; Michael Shoen's Motion for Remittitur or in the Alternative New Trial"; (2) plaintiffs' "Motion to Amend Judgment"; and (3) plaintiffs' "Motion for an Award of Attorney's Fees."

## I. BACKGROUND

This case involves a claim for attorney's fees by three Arizona law firms against members of the Shoen family formerly represented by the plaintiffs. In early 1988, there was a struggle for control of Amerco, Inc. ["Amerco"], which is the parent company of U-Haul. There was a split in the Shoen family, which owns essentially all of the stock of Amerco. One group, headed by Joseph Shoen, became known as the "inside group," and the other group, the defendants in this action, became known as the "outside group."

In July 1988, the inside group gained control of Amerco by causing an additional 8,099 shares of stock to be issued from the company to employees of Amerco who were loyal to the inside group. In the fall of 1988, the outside group, represented by the Phoenix law firm of Meyer, Hendricks, filed a lawsuit against the inside group in the Maricopa county superior court [the "share case"].

Meyer, Hendricks represented the outside group for approximately three months in the share case, during which time that firm billed, and was paid, attorney fees in excess of $600,000. In October 1988, the defendants sought to replace Meyer, Hendricks with the law firm of Marvin Johnson, P.C. ["Johnson"]. Johnson sent a "fee letter" to four members of the outside group, stating that he would represent the defendants, with the assistance of attorney Robert Lesher ["Lesher"]. Three members of the outside group signed the fee letter and returned it to Johnson.

The fee letter provided that Johnson would represent the defendants in the case in which they had previously been represented by Meyer, Hendricks. The fee letter also called for a $250,000 retainer, payable in two installments at the outset of the representation. It further stated that Johnson did not charge hourly rates, and that "[w]hen concluded," Johnson would give the defendants a bill, "payable on presentation with interest at the legal rate until paid." If the fee could not be agreed to, the fee letter contemplated arbitration to determine the reasonable value of the services rendered.

The share case plaintiffs, the defendants in this action, sought a temporary restraining order, permanent relief, and damages. A state trial court denied the outside group's request for an injunction invalidating the inside group's issuance of the 8,099 shares of Amerco stock; that ruling was affirmed by the Arizona court of appeals. The share case went to trial in the Maricopa county superior court in the fall of 1994, and the outside group obtained a $1.47 billion jury verdict. The jury verdict in that action was ordered remitted to $461 million by the state trial court in February 1995.

Johnson and Lesher aver that in addition to their representation of the defendants in the share case, they represented the defendants in seven other lawsuits which were filed either by the defendants or against them. In another action, referred to by the parties as the "scheme case," the defendants (or "outsiders") obtained a defense verdict. The defendants were represented by attorney Thomas Zlaket ["Zlaket"] and Johnson in that case.

There was no separate fee arrangement for the plaintiffs' representation of the defendants in cases other than the share case. Johnson and Lesher withdrew from representation of the outside group in August 1991. Later that month, Johnson submitted a bill to the defendants in the amount of $3.5 million, on behalf of himself and Lesher, for legal services provided in all of the cases except the scheme case. Shortly thereafter, Johnson and Zlaket submitted a separate request for payment in the amount of $1 million for the scheme case.

The plaintiffs claimed that the defendants refused to pay any portion of these bills. The defendants maintained that the $250,000 constituted payment in full for the plaintiffs' services, as any payment beyond the initial $250,000 was contingent on the outside group's ultimate success in the share case and the defendants' ability to sell their shares of Amerco stock. On January 25, 1995, the jury returned a verdict in favor of the plaintiffs, awarding them a total of $1,124,000.

## II. DEFENDANTS' MOTION FOR A NEW TRIAL AND FOR REMITTITUR

The defendants bring their motion for a new trial pursuant to Rule 59, Federal Rules

of Civil Procedure. In a memorandum in support of their motion, the defendants assert four reasons why they should be given a new trial: (1) they contend that the plaintiffs introduced, over their objection, "improper, irrelevant, highly prejudicial and inadmissible" evidence of the defendants' wealth; (2) they assert that the court erred in not giving the defendants' proposed jury instruction as to the law of quantum meruit and in not giving the defendants' proposed jury instruction stating that an ambiguous fee agreement should be construed "against its attorney-drafter"; (3) they claim that the jury's verdict was inconsistent with the evidence, as the verdict assigned equal liability to defendants Samuel Shoen, Michael L. Shoen and Christa Shoen, Mary Anna Shoen–Eaton, and L.S. Shoen and Carol Shoen for Johnson's and Zlaket's work on the scheme case, when there was evidence that Johnson and Zlaket provided different amounts of service to each of the aforementioned defendants; and (4) they maintain that the evidence established as a matter of law that Johnson and Lesher were not to be paid until they had "concluded" the share case, and therefore, the jury's verdict awarding Johnson and Lesher damages for their work on the share case conflicts with the evidence. Defendant Michael Shoen also seeks remittitur of the award of damages to Zlaket for Zlaket's representation of Michael Shoen in the scheme case, as he contends that Zlaket did not represent him in the scheme case.

Rule 59(a), Federal Rules of Civil Procedure, provides that a new trial "may be granted to all or any of the parties and on all or part of the issues (1) in an action in which there has been a trial by jury, for any of the reasons for which new trials have heretofore been granted in the courts of the United States...." The decision to grant a new trial is within the court's discretion. *Murphy v. City of Long Beach,* 914 F.2d 183, 186 (9th Cir.1990).

## A. EVIDENCE OF THE DEFENDANTS' WEALTH

■ To grant a motion for a new trial based on improperly admitted evidence, the admission must have constituted prejudicial error. *Chalmers v. City of Los Angeles,* 762 F.2d 753, 761 (9th Cir.1985); Rule 61, Federal Rules of Civil Procedure. The defendants contend that evidence of a defendant's pecuniary condition is inadmissible and is grounds for a new trial if admitted. They assert that evidence of a defendant's wealth should never be admitted in setting compensatory damages. The defendants claim that the evidence of the value of their Amerco stock, of the jury verdict in the share case, and of the dividends which they received on their Amerco stock was irrelevant, as "[n]o evidence established that Defendants' ability to pay was relevant to their fee agreement."

In response, the plaintiffs argue that while it is ordinarily inappropriate to admit evidence of a defendant's wealth, the defendants opened the door on this issue by contending that the fee agreement as set forth in the October 24, 1988, fee letter was a contingent fee agreement and that the defendants would not have and could not have entered into any other type of fee agreement because of their financial circumstances.

■ Rule 402, Federal Rules of Evidence, provides that all relevant evidence is admissible, except as otherwise provided by the Constitution, Act of Congress, the Federal Rules of Evidence, or rules promulgated by the Supreme Court. Relevant evidence is evidence having the tendency to make the existence of any consequential fact more or less probable than it would be without the evidence. Rule 401, Federal Rules of Evidence. Nevertheless, relevant evidence may be excluded where its probative value is substantially outweighed by the danger of unfair prejudice, confusion of the issues or misleading the jury. Rule 403, Federal Rules of Evidence. The financial standing of a defendant is ordinarily inadmissible as evidence in determining the amount of compensatory damages to be awarded. *Geddes v. United Financial Group,* 559 F.2d 557, 560 (9th Cir.1977). "[T]he ability of a defendant to pay the necessary damages injects into the damage determination a foreign, diverting and distracting issue which may effectuate a prejudicial result." *Id.*

While evidence of a defendant's wealth is ordinarily not admissible, such evidence may

be admitted where it relates to a substantive issue at trial. *See Bower v. Weisman,* 674 F.Supp. 113, 118 (S.D.N.Y.1987). The evidence presented in this action related only to the results obtained in the share case, and the value of the defendants' Amerco stock. This information was highly relevant to the parties' asserted interpretations of the fee agreement. The defendants vigorously contended that the fee agreement between themselves and Johnson was a contingent fee agreement, whereby Johnson would only be paid if the defendants were able to regain control of the Amerco treasury through the share case. They also claimed that they would not have entered into any fee agreement other than a contingent fee agreement, because, unless they regained control of the company, they were unable to sell their Amerco stock to obtain money to pay attorneys' fees. The defendants testified that they discussed with Johnson their inability to pay substantial fees up front prior to entering into the fee agreement with him. Indeed it was their stressed financial circumstances which they claim required them to forsake the competent, but costly, services of Meyer, Hendricks. The latter firm had charged the outsiders over $600,000 after but three months of legal representation.

The plaintiffs submitted evidence of the verdict obtained in the share case to show that the purported contingency in the fee agreement had been satisfied, as the defendants obtained a favorable verdict in the share case. The defendants were questioned about their ability to sell their Amerco stock to show that the jury verdict in the share case would give the defendants control of the Amerco treasury. The defendants were questioned about their receipt of dividends on such stock only to rebut the defendants' assertion that they would not have entered into any fee agreement other than a contingent agreement because of their inability to obtain any value from their Amerco stock. The evidence of the defendants' "wealth" was highly probative on the issue of interpretation of the fee agreement.

The defendants made that information relevant through their testimony that they discussed their financial condition with Johnson prior to their signing the October 24, 1988, fee letter, and also through their asserted interpretation of the fee agreement, whereby they claimed Johnson and Lesher were entitled to payment beyond the $250,000 retainer only if the defendants were able to regain control of Amerco through the share case. The defendants cannot rely on their asserted financial condition as support for their interpretation of the fee agreement but prevent the plaintiffs from presenting any evidence to rebut those assertions. While evidence of a defendant's financial condition is ordinarily irrelevant in a trial dealing only with compensatory damages, the evidence presented in this case as to the jury verdict in the share case and the value of the defendants' Amerco stock was relevant to the interpretation of the fee agreement.

■ I do not believe that the relevance of this evidence was outweighed by its prejudicial effect. The jury's award of damages in the amount of $1,124,000 where the plaintiffs were seeking damages of $2.5 to $4.5 million is hardly evidence that the jury was "prejudiced" by the evidence of the share case verdict and the defendants' ability to obtain value for their Amerco stock.

The defendants argue that the discussion of the share case verdict at trial was even more prejudicial in light of the subsequent remission of that verdict to $461 million, and the fact that all but one of the share case defendants subsequently filed for bankruptcy. However, the defendants did inform the jury at trial that the share case verdict was not final and was subject to reduction. Although the jury was not aware of the action ultimately taken with respect to the share case verdict, they were aware that the verdict had not been reduced to judgment.

Considering the issues raised at trial, I believe that the evidence concerning the defendants' Amerco stock and the share case verdict was properly admitted and was not prejudicial. Therefore, I do not believe that the defendants are entitled to a new trial on the basis of the admission of such evidence.

**B. JURY INSTRUCTIONS**

■ Incorrect or inadequate jury instructions can be a basis for a new trial.

*Murphy,* 914 F.2d at 186. In diversity cases, the substance of the jury instructions is governed by state law, but "[t]he question of whether an incorrect instruction is prejudicially erroneous is governed by federal law." *In re Asbestos Cases,* 847 F.2d 523, 524 (9th Cir.1988) (citations omitted). The jury instructions need only describe the applicable law in a manner that permits the jury intelligently to decide the issues. *See Los Angeles Memorial Coliseum Comm'n v. National Football League,* 726 F.2d 1381, 1398 (9th Cir.), *cert. denied,* 469 U.S. 990, 105 S.Ct. 397, 83 L.Ed.2d 331 (1984).

■ The defendants assert that the court's failure to give their proposed instructions on quantum meruit and contract interpretation was error. Specifically, they contend that the quantum meruit instruction was incomplete in that it failed to instruct the jury that there could be no quantum meruit recovery if an express contract existed. They also assert that the jury should have been given their proposed contract interpretation instruction which stated that an ambiguous or equivocal fee agreement should be construed against the attorneys who drafted it.

## 1. Quantum Meruit

■ Under Arizona law, one cannot recover damages in quantum meruit if an express contract exists. *Ruck Corp. v. Woudenberg,* 125 Ariz. 519, 611 P.2d 106, 108 (Ct.App. 1980). However, the fee agreement in this case contemplated that the fees might be based on quantum meruit. The fee agreement stated that if there was disagreement as to the fees, arbitration might be used to determine the reasonable value of the lawyers' services. Contrary to the defendants' assertion, the quantum meruit instruction which was given did not "compel" the jury to award damages to the plaintiffs.

The quantum meruit instruction which was given stated:

When one is employed in the services of another for any period of time, the law implies a promise to pay what such services are reasonably worth. Plaintiffs are entitled to the reasonable value of services they rendered to defendants unless you find that it is fair for defendants to receive the benefit of plaintiffs' services without paying for them.

The defendants' proposed instruction would have added language stating that,

if you find that any one or all of the plaintiffs have an express contract with the defendants then you must enforce that express contract pursuant to its terms and not award the plaintiffs the value of the services that they are claiming.

*Defendants' Proposed Jury Instructions,* no. 2. However, under either the fee agreement, or quantum meruit, the analysis was the same. The plaintiffs were entitled to recover the reasonable value of their services unless the jury found that the plaintiffs were not entitled to compensation for their services. A number of the defendants testified that they owed the plaintiffs nothing because that was what their agreement provided. Defendants' counsel argued to the jury that no fee was owed. Under the instruction which was given, the jury was free to conclude that the plaintiffs had not satisfied the terms of their fee agreement and thus were not entitled to recover any fees; the jury did not accept the defendants' position.

## 2. Contract Interpretation

■ Failure to give the contract interpretation instruction was harmless. The defendants made the argument during trial that it was Johnson's responsibility to include in the fee letter all of the relevant terms, as he was the drafter of the agreement. It was not necessary to give an instruction repeating this argument. Neither the court nor plaintiffs' counsel asserted that the defendants' contention regarding the drafting of the contract was incorrect.

Furthermore, the defendants in this case included L.S. Shoen, a lawyer, Samuel Shoen, an M.D., and Michael Shoen, a lawyer. The defendants primarily involved in the negotiation of the fee agreement were not unsophisticated; they were persons who had substantial experience in business. In light of the argument made by the defendants' counsel at trial, and the level of sophistication of the defendants who were involved in obtaining Johnson's services, the defendants' contract

interpretation instruction was not necessary and, in my opinion, its omission was harmless.

## C. EVIDENCE IN SUPPORT OF THE JURY'S VERDICT

The court has the discretion to grant a new trial where the verdict is contrary to the clear weight of the evidence. *McGhee v. Arabian American Oil Co.*, 871 F.2d 1412, 1420 (9th Cir.1989). Although the court may weigh the evidence and credibility of the witnesses, it may not grant a new trial just because it may have come to a different result than that reached by the jury. *Roy v. Volkswagen of America, Inc.*, 896 F.2d 1174, 1176 (9th Cir.1990), *cert. denied*, 500 U.S. 928, 111 S.Ct. 2042, 114 L.Ed.2d 126 (1991) (citation omitted).

### 1. Damages assessed against Michael Shoen

The defendants assert that there is no evidence to support the jury's award of damages in favor of Zlaket and against Michael Shoen for services rendered by Zlaket in "the share case." The defendants are presumably referring to the scheme case, as Zlaket was not awarded any damages for services rendered in the share case. The defendants assert that Michael Shoen testified that he sent a letter to Zlaket inquiring as to whether Zlaket was representing him in the scheme case and that he received no response to the inquiry. Furthermore, they assert that Michael Shoen testified that it was his belief, because of the lack of a response to his inquiry, that he was represented only by Johnson in the scheme case.

The plaintiffs contend that there was evidence to support the jury's award of damages against Michael Shoen. They claim that, on cross-examination, Michael Shoen

clarified his testimony and admitted that, while he never formalized an agreement with Plaintiff Zlaket, he fully understood that Plaintiff Zlaket was rendering legal services on his behalf.

The defendants do not refute this argument in their reply brief.

I believe that there was sufficient evidence to support the jury's award of damages against Michael Shoen and in favor of Zlaket. Although there was never a formalized agreement with respect to Zlaket's representation of Michael Shoen, Michael Shoen conceded on cross-examination that it was his understanding that Zlaket was representing all of the Shoen defendants in the scheme case.

### 2. Apportionment of damages

The defendants contend that the jury's apportionment of damages equally among L.S. Shoen, Michael Shoen, Samuel Shoen and Mary Anna Shoen–Eaton for Johnson's and Zlaket's representation of those defendants in the scheme case is against the clear weight of the evidence. The defendants claim that there was testimony that Zlaket and Johnson did not represent Mary Anna Eaton, L.S. Shoen and Michael Shoen in the scheme case until November 1989, nearly one year after that action was commenced. They also maintain that there was testimony that L.S. Shoen and Michael Shoen were dismissed from the scheme case prior to the trial in that action. Therefore, they contend that the jury's equal apportionment of damages among those four defendants was clearly contrary to the evidence.

The defendants stipulated to the questions contained on the form of verdict which was given to the jury. There was no mention in the verdict form of apportionment of damages, and there was no instruction requested on apportionment of damages. Moreover, Johnson and Zlaket's work in the scheme case benefitted all of the defendants involved in that action. The jury was free to determine that all of the defendants in the scheme case benefitted equally from Johnson's and Zlaket's work in that case. Consequently, I do not believe that the jury's equal apportionment of damages was against the clear weight of the evidence.

### 3. Johnson's and Lesher's entitlement to fees for the share case

The defendants maintain that the evidence "clearly established" that Johnson and Lesher would only be entitled to payment of

fees if they represented the defendants in the share case until that case was "finished." The defendants point to the language in the October 24, 1988, fee letter which stated that Johnson would submit a bill for his services "[w]hen concluded," and a letter written by Lesher, which was admitted into evidence, stating that it was his understanding that Johnson and Lesher would receive a modest down-payment and would receive further fees "when that lawsuit is finished." The defendants maintain that their interpretation of the fee agreement prevailed "as a matter of law."

The defendants' argument on this issue is meritless. Both Johnson and Lesher, testified that the fee agreement was not contingent, and that "[w]hen concluded" did not mean that they were required to represent the defendants through the end of the share case trial and any appeals therefrom in order to be entitled to the payment of further fees. The meaning of the phrase "[w]hen concluded" was disputed at trial. If the jury accepted the defendants' somewhat strained understanding of the arrangement with the plaintiffs, the jury could have decided in the defendants' favor. However, the defendants' interpretation of the contract did not prevail; it did not convince the jury; and it does not warrant this court's ordering a new trial. Thus, the award of damages to Johnson and Lesher for their work in the share case was not against the clear weight of the evidence.

### III. MOTION TO AMEND THE JUDGMENT

The plaintiffs filed a motion to amend the judgment, pursuant to Rule 59(e), Federal Rules of Civil Procedure. In their motion, the plaintiffs ask that they be awarded prejudgment interest on the damages awarded. The plaintiffs set forth two bases for their request for an award of prejudgment interest: first, they assert that they are entitled to prejudgment interest under Arizona law because their claim was a liquidated claim; second, they claim that they are entitled to prejudgment interest on the basis of the fee agreement.

Under Arizona law, prejudgment interest is a matter of right on liquidated claims. *Fleming v. Pima County,* 141 Ariz. 149, 685 P.2d 1301, 1307 (1984). A claim is liquidated if the evidence furnishes data which, if believed, makes it possible to compute the amount with exactness, without reliance on opinion or discretion. *Schade v. Diethrich,* 158 Ariz. 1, 760 P.2d 1050, 1063 (1988) (citations omitted). A good faith dispute over liability will not defeat a recovery of prejudgment interest on a liquidated claim. *Fleming,* 685 P.2d at 1307.

The plaintiffs' claim in this action was not liquidated. Although the plaintiffs did send the defendants a bill for their legal services in 1991, the amount of the bill was calculated purely through discretion. The bill was not accompanied by any supporting data to substantiate the plaintiffs' determination of the amount owed. The plaintiffs were seeking the "reasonable value" of their services. By its very nature, that phrase implies an unliquidated claim. What may be reasonable to one person may be unreasonable to another.

The plaintiffs maintained no records of the number of hours which they expended in their representation of the defendants. Even the plaintiffs' experts who testified at trial varied in their calculations of the reasonable value of the plaintiffs' services. Because the plaintiffs' claim was not liquidated, they are not entitled to an award of prejudgment interest under Arizona law.

For many of the same reasons that the plaintiffs are not entitled to an award of prejudgment interest under Arizona law, they are not entitled to an award of prejudgment interest under the fee agreement. As a basis for their requested recovery of prejudgment interest under the fee agreement, the plaintiffs point to the language in the fee letter which states "[w]hen concluded, I will give you a bill, payable on presentation with interest at the legal rate until paid."

However, the amount of the bill was not determined until the conclusion of this trial. As stated above, the calculation of the reasonable value of the plaintiffs' services is not a calculation which could be made without the exercise of discretion. The amount the plaintiffs were owed was unliquidated until it was reduced to a verdict. Because of the

uncertainty as to the amount of the bill prior to trial, the plaintiffs are not entitled to an award of prejudgment interest on the basis of the fee agreement.

The plaintiffs contend that the delay in liquidation of their claim was caused by the defendants. The plaintiffs assert that the fee agreement provided for liquidation of the fee amount through submission of the bill to a county bar committee for resolution. The plaintiffs maintain that the defendants should not be permitted to benefit from their refusal to abide by the fee agreement and submit the matter for arbitration.

However, the fee agreement states that if the bill submitted by the plaintiffs was not satisfactory, "a county bar committee *may* set it, and bind both sides." (emphasis added) The language of the fee agreement shows that submission of the bill to a bar committee for resolution was permissive, not mandatory. Therefore, the defendants were not compelled to liquidate the claim through arbitration, and they should not be penalized for their refusal to resolve their dispute through submission of the matter to a bar committee.

■ Furthermore, I believe that the jury's award was based upon quantum meruit, and one is not entitled to prejudgment interest upon a quantum meruit award. *See d'Hedouville v. Pioneer Hotel Co.*, 552 F.2d 886, 895 (9th Cir.1977) (Stating that the Arizona supreme court has adopted the rule that interest is allowed on unliquidated damages for services rendered only from the date of judgment). The plaintiffs are not entitled to an award of prejudgment interest under Arizona law or the fee letter.

## IV. PLAINTIFFS' MOTION FOR ATTORNEYS' FEES

■ The plaintiffs have filed a motion for an award of attorneys' fees. In this diversity action, the availability of attorneys' fees is governed by state law. *Diamond v. John Martin Co.*, 753 F.2d 1465, 1467 (9th Cir. 1985). The plaintiffs are requesting attorneys' fees pursuant to Ariz.Rev.Stat. § 12–341.01(A), which provides

[i]n any contested action arising out of a contract, express or implied, the Court

may award the successful party reasonable attorneys' fees.

The plaintiffs assert that, because the present action arose out of a contract, express or implied, and because they were successful on all of their claims and on all of the defendants' counterclaims, they are entitled to an award of attorneys' fees. The issue as to attorneys' fees for the plaintiffs was fully presented in the parties' written submissions. The court finds that oral argument on *this* motion is not necessary.

## A. ENTITLEMENT TO ATTORNEYS' FEES

■ An award of attorneys' fees pursuant to Ariz.Rev.Stat. § 12–341.01(A) is discretionary. *Layne v. Transamerica Financial Services, Inc.*, 146 Ariz. 559, 707 P.2d 963, 966 (Ct.App.1985). The Arizona supreme court has listed six factors to be considered in determining whether attorneys' fees should be awarded under § 12–341.01(A). *Associated Indemnity Corporation v. Warner*, 143 Ariz. 567, 694 P.2d 1181, 1184 (1985). These factors are: (1) the merits of the unsuccessful party's claim or defense, (2) whether the litigation could have been avoided or settled and the successful party's efforts were completely superfluous in achieving the result, (3) whether assessing fees against the unsuccessful party would cause extreme hardship, (4) whether the successful party prevailed with respect to all of the relief it sought, (5) the novelty of the legal question presented, and (6) whether the award in any particular case would discourage other parties from litigating tenable claims or defenses for fear of incurring liability for substantial amounts of attorneys' fees. *Id.*

### 1. The Merits of the Unsuccessful Party's Claim or Defense

The defendants were ultimately unsuccessful on their defense. They claimed that the fee agreement between the parties was a contingent agreement and that the plaintiffs were not entitled to any fees (beyond the retainer) because they had failed to fulfill the contingency. This defense was arguably the principal issue in the case and was squarely

disputed by the plaintiffs. The plaintiffs testified that the agreement was not a contingent fee agreement. The jury returned a verdict in favor of the plaintiffs notwithstanding the fact that the defendants testified that there was a clear and firm understanding that no further fees were to be paid until the outsiders were put in control of the company.

The defendants were also unsuccessful on their counterclaims. They voluntarily dismissed one of their counterclaims, and a verdict was directed against them on the remaining two counterclaims. I believe that the defendants' counterclaims were largely unsubstantiated.

## 2. Whether the Litigation Could Have Been Avoided or Settled

The plaintiffs made a settlement offer on January 4, 1995, thirteen days before the start of the trial in this action. However, the defendants rejected this offer and did not make any counter-offer. The defendants initiated previous settlement discussions with Zlaket, offering him a $100,000 promissory note to be paid over 5 years at 9% interest, and, subsequently, an additional $100,000 if the defendants were able to recover at least $10 million in the share case. Zlaket rejected this offer.

The defendants claimed that Johnson and Lesher were not entitled to any fees, while the plaintiffs claimed that they were entitled to somewhere between $2 and $3.5 million. The defendants contend that they should be entitled to their day in court and that there is no law which compels settlement. However, the defendants appear to have made no effort to settle Johnson's and Lesher's claims.

## 3. Hardship of the Unsuccessful Party

The plaintiffs assert that the defendants are "multi-millionaires" and that the assessment of fees against them would not be a hardship. The defendants dispute this assertion and claim that an assessment of fees against them would cause extreme hardship. They contend that they have no funds to pay the judgment, let alone the additional $310,000 in attorneys' fees requested by the plaintiffs. They assert that the filing for bankruptcy by the $461 million judgment debtors in the share case makes their recovery on that judgment uncertain. While the assessment of fees would obviously be unwelcome to the defendants, I believe that "hardship" is not a proper basis for the denial of fees in this case.

## 4. Whether the Successful Party Prevailed with Respect to All of its Requested Relief

The plaintiffs assert that they were successful with respect to all of their claims and all of the defendants' counterclaims. The defendants contend that the plaintiffs' recovery of $1.24 million, when they were seeking between $2.5 and $4 million, shows that they were not successful with respect to all of their requested relief.

In my opinion, the jury's failure to accept the plaintiffs' experts full valuation of their services constitutes a lack of success only as to the *relief* which the plaintiffs sought. I conclude that the plaintiffs were "successful" on all of their claims and on all of the defendants' counterclaims; they were seeking and won the "reasonable value" of their services, as determined by the jury.

## 5. Novelty of the Legal Question

The legal question involved in this dispute was not novel. Although large sums of money were involved, this was a simple contract dispute over the meaning of a fee agreement. While the parties differed in their interpretation of that agreement, there were no novel legal questions presented in this action.

## 6. Risk of Deterrence

I do not believe that an award of attorneys' fees in this case would discourage other parties from advancing tenable claims or defenses. The defendants were aware that there was the possibility that they might be assessed attorneys' fees in the event that they lost this action. They themselves requested an award of attorneys' fees under Ariz.Rev. Stat. § 341.01(A) if they were successful in this action.

While the defendants' defense was marginally plausible, it was not of such merit that

an award of attorneys' fees would deter other litigants from advancing tenable defenses. Consequently, I believe that this factor weighs in favor of the plaintiffs.

After considering all of the above-listed factors, I believe that the plaintiffs are entitled to an award of attorneys' fees as the successful party in this action. The plaintiffs were successful on all of their claims and on all of the defendants' counterclaims, the defendants made virtually no effort to resolve this case, the imposition of fees would not cause extreme hardship to the defendants and would not deter others from defending legitimate contract claims.

## B. REASONABLENESS OF THE REQUESTED FEES

I do not believe that the plaintiffs' request for $310,000 in fees is reasonable, based upon their attorneys' accounting of the number of hours expended in working on this litigation. Attached to their memorandum in support of their motion for an award of attorneys' fees is an itemized listing of the number of hours expended by plaintiffs' counsel on this case. The listing shows 652.8 hours of work by attorneys and 153.2 hours of work by paralegals.

In an affidavit attached to the plaintiffs' memorandum, attorney William R. Jones, one of the attorneys for the plaintiffs, states that reasonable hourly rates in Phoenix would be $250 for partners, $200 for associates, and $75 for paralegals. However, assuming a $75 hourly rate for the work performed by paralegals, the plaintiffs request for $310,000 in fees amounts to a rate slightly in excess of $457 per hour for work performed by the plaintiffs' attorneys.

The plaintiffs are lawyers who justify their requested amount by stating that they had a "quasi-contingent" fee agreement with the lawyers who presented this case to the court on their behalf. The plaintiffs claim that under an ordinary contingent fee agreement providing for assessment of fees in the range of 33% to 40% of the amount recovered, they would be entitled to between $371,000 and $450,000 to pay their attorney fees. However, the agreement between the plaintiffs and their counsel did not provide for any specific rate of recovery. The plaintiffs and their counsel had an oral fee agreement whereby plaintiffs' counsel would recover from the plaintiffs a "fair and reasonable fee," with the amount of the fee primarily dependent upon the plaintiffs' success in this action.

The plaintiffs assert that attorneys entering into contingent fee agreements accept the risk that they may not recover any fees, and are therefore entitled to a "premium" for their work. Because the plaintiffs failed to set forth their contingent fee agreement with sufficient specificity, they will not be awarded fees on the basis of that agreement.

I believe that a fair and reasonable fee can be determined more accurately by multiplying the hours expended by plaintiffs' counsel by the reasonable hourly rate. *See Hensley v. Eckerhart,* 461 U.S. 424, 437, 103 S.Ct. 1933, 1941, 76 L.Ed.2d 40 (1983) (Discussing the computation of a reasonable fee in a Title VII action). Rule 2.20 of the Rules of Practice of the United States District Court for the District of Arizona provides a nonexhaustive list of 12 factors to be considered in determining the reasonableness of a requested attorneys' fee award. The factors are: (1) the time and labor required, (2) the novelty and difficulty of the questions presented, (3) the skill necessary to perform the legal service, (4) the preclusion of other employment because of acceptance of the action, (5) the customary fee in similar matters, (6) whether the fee agreement is fixed or contingent, (7) any time limitations imposed by the client or the circumstances, (8) the amount of money involved and the results obtained, (9) the experience, reputation and ability of counsel, (10) the undesirability of the case, (11) the nature and length of the professional relationship between the attorney and the client, and (12) awards in similar actions. Mr. Jones avers that he consulted with the defendants' counsel in an effort to resolve the plaintiffs' request for attorneys' fees, in accordance with Rule 2.20(d)(1) of the Rules of Practice of the United States District Court for the District of Arizona.

As noted earlier in another context, there were no novel legal questions presented in this case. The plaintiffs' attorneys'

expenditure of approximately 653 hours of time on this case over three years suggests that it was not overwhelmingly time consuming. Although the amount of money involved in this action was substantial, it was not a case which required extensive preparation with a large number of witnesses. As stated above, the plaintiffs' oral "quasi-contingent" fee agreement with their attorneys did not assign any numbers to the contingent agreement, and therefore, the agreement is not of great assistance in determining the reasonableness of the requested award.

The defendants assert that the expenditure of 652.8 hours by plaintiffs' counsel was excessive. However, they make no objections to any of the specific time entries of plaintiffs' counsel, as they are required to do by Rule 2.20(f), Rules of Practice of the United States District Court for the District of Arizona. I find that the number of hours expended by plaintiffs' counsel is not excessive.

 However, I do not believe that the plaintiffs' attorneys are entitled to remuneration in the amount of $457 per hour. Therefore, the plaintiffs will be awarded fees consistent with the hourly rates proposed by Mr. Jones in his affidavit. The defendants made no objections to the hourly rates suggested by Mr. Jones. In his affidavit, Mr. Jones lists the number of hours expended on this case by himself and other employees of his law firm as follows:

Mr. Jones (partner)–152.2 hours
Mr. Berk (associate)–456.6 hours
Mr. LaCourte (associate)–22.6 hours
Ms. Fisher (associate)–15.1 hours
Mr. Blonstein (summer law clerk/associate)–
 6.9/6.3 hours respectively
Ms. Wolfe (paralegal)–6.4 hours
Ms. Fournier (paralegal)–20.8 hours
Ms. Copeland (paralegal)–18.7 hours
Ms. Barrett (paralegal)–100.4 hours

Paralegal and law clerk services may be included in an award of attorneys' fees under Ariz.Rev.Stat. § 12–341.01. *Continental Townhouses East Unit One Association v. Brockbank*, 733 P.2d 1120, 1127 (Ariz.Ct.App. 1986). The defendants make no objection to the inclusion of services performed by paralegals in the attorneys' fee award.

Multiplying the above-listed hours by the hourly rates submitted by Mr. Jones yields the following:

| | | | | | |
|---|---|---|---|---|---|
| Mr. Jones– | 152.2 | hours | × $250/hour | – | $ 38,050.00 |
| Mr. Berk– | 456.6 | hours | × $200/hour | – | 91,320.00 |
| Mr. LaCourte– | 22.6 | hours | × $200/hour | – | 4,520.00 |
| Ms. Fisher– | 15.1 | hours | × $200/hour | – | 3,020.00 |
| Mr. Blonstein– | 6.3 | hours | × $200/hour | – | 1,260.00 |
| | 6.9 | hours | × $75/hour | – | 517.50 |
| Ms. Wolfe– | 6.4 | hours | × $75/hour | – | 480.00 |
| Ms. Fournier– | 20.8 | hours | × $75/hour | – | 1,560.00 |
| Ms. Copeland– | 18.7 | hours | × $75/hour | – | 1,402.50 |
| Ms. Barrett– | 100.4 | hours | × $75/hour | – | 7,530.00 |
| | | | | | $149,660.00 |

Therefore, the plaintiffs will be awarded $149,660 in attorneys' fees pursuant to Ariz. Rev.Stat. § 12–341.01(A).