**In re Jeffrey and Geneva DURANT, Debtors.**

**Bankruptcy No. 96–15929.**

United States Bankruptcy Court, N.D. New York.

May 12, 1999.

David P. Antonucci, Watertown, New York, for debtors.

Charu Narang, Assistant County Attorney, County Attorney's Office, Watertown, New York.

Mark Swimelar, Syracuse, New York, Chapter 12 Trustee.

## MEMORANDUM—DECISION AND ORDER

ROBERT E. LITTLEFIELD, Jr.,
Bankruptcy Judge.

Before the court is a Motion for Contempt and Damages filed by Jeffrey and Geneva Durant ("Debtors") on July 30, 1998. The Debtors ask that the Jefferson County Department of Social Services ("JCDSS") and Amy Farmer ("Farmer"), a caseworker at the JCDSS's Child Support Enforcement Services, be held in civil contempt for violating a prior order of this court and the automatic stay provisions of 11 U.S.C. § 362.[1]

## JURISDICTION

The court has jurisdiction over the parties and the subject matter of this core proceeding under 28 U.S.C. §§ 1334(b), 157(b)(1), and 157(b)(2)(A).

## FACTS

On August 28, 1987, Jeffrey Durant ("Durant") obtained a Judgment of Divorce against Wendy Durant (now known as Wendy Boice) ("Boice") from Hon. George G. Inglehart of the State of New York Supreme Court, County of Jefferson. Judge Inglehart ordered Durant to pay Boice thirty-five dollars per week as child support for each of the three children residing with her. Boice then filed a Peti-

tion for Enforcement of Child Support Payments against Durant on October 25, 1993. On August 23, 1994, James L. Gorman, Hearing Examiner, Jefferson County Family Court issued a decision whereby child support payments were to be made through the JCDSS's Support Collection Unit from an income execution on Durant's milk checks.

Debtors filed a Chapter 12 petition on November 5, 1996. Thereafter, JCDSS continued to levy on the Debtors' milk checks. Debtors' counsel then brought a contempt proceeding returnable March 27, 1997. On April 17, 1997, this court signed an order directing that all income levies and executions filed by JCDSS against the income of the Debtors shall cease effective March 27, 1997. According to Farmer's affidavit, she was told by her supervisors to terminate the income execution on March 26, 1997.

On October 20, 1997, Durant filed a petition in Jefferson County Family Court for a downward modification of his child support obligations to Boice, which was denied by Robert Jenkins, Hearing Examiner, Jefferson County Family Court, on June 19, 1998. According to Durant's affidavit, on July 24, 1998, Debtors received an income execution for child support arrears of $9,324.78. Debtors, however, claim that all post-petition support was current and that the pre-petition support claim was treated in the plan.

In her affidavit, counsel for the JCDSS and Farmer, Charu Narang, Esq. ("Narang"), Assistant County Attorney for the County of Jefferson, states that she authorized Farmer to garnish the milk checks of the Debtors on June 25, 1998, for current support only because she believed that the Debtors' Chapter 12 Plan had been confirmed and that it contained no provision for the payment of the child support.

---

1. Debtors' brief requests that the Jefferson County Attorney also be held in contempt. Debtors did not include the Jefferson County Attorney in their motion and have not raised this issue until now. Consequently, this issue is not properly before the court and will not be addressed.

(Narang Am.Aff. at 2, ¶ 7.) Farmer's affidavit describes that on March 26, 1997, she was first told to terminate the income execution on Debtor's milk checks. (Farmers Aff. at 2, ¶ 7.) Then on April 21, 1998, she was again told to suspend the child support income executions. (Farmer Aff. at 2, ¶ 9.) Further, on June 25, 1998, Farmer states that she was told by Narang that she could levy an income execution on Debtors, milk checks for current support. (Farmer Aff. at 2, ¶ 11.) This stayed in effect until July 30, 1998, when the execution was amended to garnish only for current support as the original execution inadvertently garnished for arrears. (Farmer Aff. at 2, ¶ 12.) Finally, Narang directed Farmer to suspend the execution entirely on August 10, 1998. (Farmer Aff. at 2, ¶ 13.)

Debtors' motion alleges that the JCDSS and Farmer, individually, should be held in civil contempt for violating this court's prior Order of April 17, 1997, and the automatic stay provisions of 11 U.S.C. § 362. The court held a hearing on the matter on September 10, 1998. At the conclusion of the hearing, the parties were asked to submit briefs in support of their positions on the motion for contempt.

### ARGUMENT

In their opposition to the motion for contempt, JCDSS and Farmer explain their continuing levy on the Debtors' milk checks, in alleged violation of a prior order of this court and the automatic stay. As an explanation, they contend that this court's order lacked specificity and was therefore not effective. (Narang Am.Aff. ·at 4, ¶¶ 22, 23.) Further, they contend that despite an order of this court specifically requiring all income levies and executions by the JCDSS against the Debtors to cease, as well as the automatic stay provisions of § 362,[2] in order for the JCDSS Support Collection Unit to terminate these services, a modification petition must be filed by the Debtors in Jefferson County Family Court. (Narang Am.Aff. at 4, ¶¶ 25, 26.) The memoranda of law submitted by the JCDSS and Farmer contain only one defense which is that they are immune from any liability under the doctrine of sovereign immunity and the Eleventh Amendment.

Debtors argue: the Eleventh Amendment does not apply or if it does apply, it has been waived; the respondents should be held in contempt; damages should be awarded against them; and sanctions should be ordered in accordance with FED. R.BANKR.P. 9011.

### DISCUSSION

In their original memorandum of law, JCDSS and Farmer rely on *Seminole Tribe of Florida v. Florida*, 517 U.S. 44, 116 S.Ct. 1114, 134 L.Ed.2d 252 (1996), which stands for the proposition that each state is a sovereign entity which is not subject to suit by an individual without that state's consent. In order for *Seminole* to apply it must first be shown that JCDSS and Farmer are each considered an "arm of the state" for Eleventh Amendment purposes. In their Supplemental Memorandum of Law, they cite to New York State Social Services Law ("SSL") in an attempt to show that they warrant this type of treatment. SSL section 111–h governs the establishment of the County Support Collection Unit and states in relevant part:

1. Each social services district shall establish a support collection unit in accordance with regulations of the department to collect, account for and disburse funds paid pursuant to any order of

---

**2.** 11 U.S.C. § 362(a) states in part that the filing of a petition "operates as a stay, applicable to all entities, of … (3) any act to obtain possession of property of the estate or of property from the estate or to exercise control over property of the estate."

11 U.S.C. § 362(b)(2)(B) provides that the filing of a petition does not operate as a stay "of the collection of alimony, maintenance, or support from the property that is not property of the estate."

child support or child and spousal support issued under the provisions of section two hundred thirty six or two hundred forty of the domestic relations law, or article four, five, five-A or five-B of the family court act ...

N.Y. SOCIAL SERVICES LAW § 111–h (McKinney Supp.1998).

SSL section 111–d provides for state reimbursement to the county of a portion of funds expended by the local Support Collection Unit:

1. The provisions of section one hundred fifty-three of this chapter shall be applicable to expenditures by social services districts for activities related to ... the enforcement and collection of support obligations owed to recipients of aid to dependent children and persons receiving services pursuant to section one hundred eleven-g of this title.

2. The local share of expenditures incurred by the department for the provision of centralized collection and disbursement services pursuant to section one hundred eleven-h of this title shall be charged back to the social services districts. The local share shall be fifty per centum of the amount expended by the department after deducting therefrom any federal funds properly received or to be received on account thereof ...

N.Y. SOCIAL SERVICES LAW § 111–d (McKinney Supp.1998).

JCDSS and Farmer assert that these sections of the statute "clearly" show that the JCDSS is established under New York State statutes, and funded in part by New York State funds. (JCDSS and Farmer's Supp.Mem. of Law at 2.) A cursory review of the case law on the subject reveals that the issue requires considerably more analysis than is offered by any of the parties in this matter.

In addition to the statute, JCDSS and Farmer cite two cases which they claim support their position. In *Rivkin v. County of Montgomery*, 838 F.Supp. 1009 (E.D.Pa.1993), the court dealt with a suit by a litigant against a county prothonotary. The court ruled that the prothonotary was not entitled to immunity because the Commonwealth of Pennsylvania would have nothing to do with the relief sought in the case and that any relief would most likely be paid from the county treasury. *Id.* at 1012. In coming to this conclusion, the court stated that one of the most important factors in determining immunity is "whether any judgment would be paid from the state treasury." *Id.* This court is in agreement with *Rivkin*, however, other than submitting sections of the SSL for the court to interpret, the JCDSS and Farmer have made no argument to distinguish themselves from the county prothonotary or reasons why they should not be treated in the same manner.

Next, the JCDSS and Farmer cite *In re Platter*, 140 F.3d 676 (7th Cir.1998), where the United States Court of Appeals, Seventh Circuit ruled that since the Dekalb County Division of Family and Children Services ("DFCS") had instituted an adversary proceeding in bankruptcy court, it had waived its Eleventh Amendment immunity. *Id.* at 679–80. In its opinion, the court put forth four factors which DFCS would have to establish in order to warrant immunity. *Id.* at 679. These factors are: (1) that it is an agency of the state; (2) that the Eleventh Amendment applies; (3) that Congress had no authority to abrogate its Eleventh Amendment immunity under the Bankruptcy Code; and (4) that DFCS has not waived this immunity. *Id.* The court went on to discuss the effect of the filing of an adversary proceeding on the issue of immunity, but never discussed the first factor of whether the DFCS is an agency of the state.

■ This court is in agreement with the assertion that if a state entity files an adversary proceeding in a bankruptcy case, that state entity has waived its Eleventh Amendment immunity. However, that is not the issue in the case at hand since there has been no adversary nor any

claim filed by JCDSS or Farmer. *Platter* does not apply to the issue here which is whether JCDSS and Farmer are to be considered arms of the state and immune from suit.

■ JCDSS and Farmer are contending that the Debtors' motion for contempt against them is barred by the Eleventh Amendment. They bear the burden of proving that they are entitled to this immunity. " 'Whatever its jurisdictional attributes, [Eleventh Amendment immunity] should be treated as an affirmative defense,' and '[l]ike any other defense, that which is promised by the Eleventh Amendment must be proved by the party that asserts it and would benefit from its acceptance.' " *Christy v. Pennsylvania Turnpike Commission,* 54 F.3d 1140, 1144 (3rd Cir.1995) (quoting *ITSI TV Productions, Inc. v. Agricultural Associations,* 3 F.3d 1289, 1291 (9th Cir.1993)).

The Eleventh Amendment of the United States Constitution states:

> The Judicial power of the United States shall not be construed to extend to any suit in law or equity, commenced or prosecuted against one of the United States by Citizens or subjects of any Foreign State.

U.S. Const. Amend. XI. The Supreme Court has expanded the effect of the wording of the amendment by barring not only suits brought against a state by citizens of another state but also suits against a state brought by citizens of the same state. *Edelman v. Jordan,* 415 U.S. 651, 94 S.Ct. 1347, 39 L.Ed.2d 662 (1974); *Hans v. Louisiana,* 134 U.S. 1, 10 S.Ct. 504, 33 L.Ed. 842 (1890). The Supreme Court has also held that counties are not automatically immune from suit under the Eleventh Amendment. *See Mt. Healthy City School Board of Educ. v. Doyle,* 429 U.S. 274, 280, 97 S.Ct. 568, 50 L.Ed.2d 471 (1977); *Edelman v. Jordan,* 415 U.S. 651, 668, 94 S.Ct. 1347, 39 L.Ed.2d 662 (1974); *Lincoln County v. Luning,* 133 U.S. 529, 10 S.Ct. 363, 33 L.Ed. 766 (1890). The Court in *Mt. Healthy City School Board* deter-mined that Eleventh Amendment immunity for the Mt. Healthy Board of Education depended on whether it was to be treated as an "arm of the state," or as a municipal corporation or other political subdivision to which the Eleventh Amendment would not extend. *Mt. Healthy City School Board of Educ.,* 429 U.S. at 280, 97 S.Ct. 568. The answer to this question, the Court stated, depends on the "nature of the entity created by state law." *Id.*

The Second Circuit has addressed the "arm of the state" doctrine, and has twice discussed the issue of whether county branches of the Department of Social Services are to be considered arms of the state. In *Holley v. Lavine,* 605 F.2d 638 (2d Cir.1979), the Monroe County Department of Social Services argued that it should be considered an arm of the state for Eleventh Amendment purposes for its administration of the Aid to Families with Dependent Children Program ("AFDC Program"). The court found that the Eleventh Amendment did not apply to the Monroe County Department of Social Services and it was not immune from suit. In support of the assertion that the decisive issue was not whether the state had control over the policies of the Monroe County Department of Social Services, the court cited *Lake Country Estates, Inc. v. Tahoe Regional Planning Agency,* 440 U.S. 391, 401, 99 S.Ct. 1171, 59 L.Ed.2d 401 (1979), in which the Supreme Court stated that it would not afford counties and municipalities Eleventh Amendment protection where those entities only exercise a "slice of state power." *Holley v. Lavine,* 605 F.2d at 643–44.

The *Holley* Court stated that the factor of greater significance was the source of the entity's funds. *Id.* at 644. The court analyzed New York Social Services Law, the New York State Constitution and New York County Law to determine whether Monroe County was reimbursed by the state for the AFDC Program. *Id.* Fifty percent of the AFDC Program's funds came from the Federal Government, twen-

ty-five percent from the state, and twenty-five percent from Monroe County. *Id.* The court concluded that Eleventh Amendment protection for Monroe County was not warranted in order to protect the state treasury from liability, and in that situation Monroe County should not be treated as an arm of the state. *Id.* at 644–45.

In contrast, in *Marbley v. Bane,* 57 F.3d 224 (2d Cir.1995), the Second Circuit held that another county branch of the New York State Department of Social Services was entitled to Eleventh Amendment immunity. The plaintiffs in *Marbley* sued county social services commissioners for their administration of New York's Home Energy Assistance Program (hereinafter "HEAP"). The court found that the county defendants were entitled to Eleventh Amendment protection because they acted as arms of the state in administering the HEAP program. *Id.* at 233. In doing so, the court looked to state law to determine the source of the funding of the HEAP Program, which was entirely funded by the state. *Id.*

The court distinguished its *Marbley* decision from its decision in *Holley* by stressing that in *Holley* it gave great weight to the fact that the entity upon whom rested the obligation to make the AFDC Program's payments to the recipient appeared to be the county. *Id.* at 233. Additionally, in *Holley* the plaintiff was suing for retroactive relief from the AFDC Program, twenty-five percent of which was funded by the state, as opposed to the situation in *Marbley* where the entire HEAP Program was funded by the state. *Id.* at 232–33.

Debtors cite *Doe, by Hickey v. Jefferson County,* 985 F.Supp. 66 (N.D.N.Y.1997), where an allegedly abused child sued the County of Jefferson, the JCDSS, and several individuals for failure to report several instances of child abuse and maltreatment. An individual defendant moved to dismiss on Eleventh Amendment grounds, which the court denied. In its decision the court noted that it was unclear whether the defendant was an employee of the

state or the JCDSS, but that issue was not outcome determinative because the plaintiff was not seeking payment from state funds or seeking to impose liability on the state. *Id.* at 69. Therefore, the court did not make an explicit finding that the JCDSS was not entitled to immunity, but stated, in general, the Eleventh Amendment does not apply to counties because they are not considered to be an arm of the state. *Id.* at 69, n. 2.

Another case decided by Hon. Thomas J. McAvoy, United States District Court, Northern District of New York, discussed the *Marbley–Holley* analysis. In *Gonzales v. Wing,* 167 F.R.D. 352 (N.D.N.Y.1996), the court stated, "in determining whether a county is entitled to immunity from suit, the Second Circuit has focused on issues such as who bears the 'ultimate responsibility' for the allegedly violated duties at issue, and ... the source of funding for the agency duties in question." *Id.* at 355. The court decided that the county branch of the Department of Social Services was not entitled to Eleventh Amendment immunity because there was an insufficient factual and legal basis submitted by the defendant to apply a *Marbley–Holley* analysis. *Id.*

Following the *Marbley–Holley* line of cases, the Second Circuit attempted to clarify the arm of the state issue in *Mancuso v. NYS Thruway Authority,* 86 F.3d 289 (2d Cir.1996), by applying a six factor test from *Feeney v. Port Authority Trans–Hudson Corporation,* 873 F.2d 628 (2d Cir.1989), *aff'd on other grounds,* 495 U.S. 299, 110 S.Ct. 1868, 109 L.Ed.2d 264 (1990). In *Mancuso,* the court found that the New York State Thruway Authority was not an arm of the state and could be held liable for monetary damages. In coming to this conclusion, the court analyzed the following factors set forth in *Feeney:* (1) how the entity is referred to in the documents that created it; (2) how the governing members of the entity are appointed; (3) how the entity is funded; (4) whether the entity's function is traditional-

ly one of local or state government; (5) whether the state has a veto power over the entity's actions; and (6) whether the entity's obligations are binding on the state. *Mancuso*, 86 F.3d at 293. If the six factors "point in different directions," a court must then determine: if allowing the entity to be sued in federal court (a) threatens the integrity of the state and (b) exposes the state treasury to risk. *Id.* "If all the elements are evenly balanced, 'the vulnerability of the State's purse [is] the most salient factor.'" *Id.* (citing *Hess v. Port Auth. Trans–Hudson Corp.*, 513 U.S. 30, 48, 115 S.Ct. 394, 130 L.Ed.2d 245, (1994)).

▮ Although the JCDSS is the entity being sued in this case, it is the Support Collection Unit which levied the income execution on the Debtors' milk checks, committing the alleged contempt. Thus, as a division of the JCDSS, the Support Collection Unit is the specific entity of concern when analyzing the *Feeney* factors in this case.

The first of the *Feeney* factors, how the entity is referred to in the documents that created it, weighs against a finding of immunity. Section 111–a designates the department [3] (hereinafter "state department") as the single state agency to supervise the administration of the state's child support program and requires that a single organizational unit be established within the state department for that purpose. N.Y. SOCIAL SERVICES LAW § 111–a (McKinney Supp.1998). However, as discussed earlier, section 111–h directs each social services district [4] (hereinafter "county SSD") to establish a support collection unit in accordance with regulations of the state department to collect, account for and disburse funds pursuant to an order of child support. N.Y. SOCIAL SERVICES LAW § 111–h (McKinney Supp.1998). Further, section 111–c directs each county SSD to establish a single organizational unit which shall be responsible for such district's activities in assisting the state in enforcement and collection of support in accordance with the regulations of the state department. N.Y. SOCIAL SERVICES LAW § 111–c (McKinney Supp.1998).

How the entity is referred to in these sections of the statute weighs against a finding of immunity because the support collection unit is created by the county SSD, even though it is state law directing it to do so in accordance with state regulations. Section 111–h clearly says that each county SSD shall establish a support collection unit. Via these sections of the statute, the state department delegates the duty of establishing the support collection unit to the county SSD and the responsibility of the county SSD's activities in assisting the state in enforcement and collection of support, to the organizational unit established by the county SSD.

The second factor, how the governing members of the entity are appointed, weighs slightly in favor of a finding of immunity. Section 65 provides that there shall be a county commissioner of public welfare in each county who shall administer the public assistance and care for which the county public welfare district is responsible. N.Y. SOCIAL SERVICES LAW § 65 (McKinney Supp.1998). The county commissioner is to be appointed in accordance with the provisions of section 116.[5]

**3.** Section 2 states that when used throughout the chapter unless otherwise stated, "[d]epartment means the state department of social services."

**4.** Section 2 states that when used throughout the chapter unless otherwise stated, "[s]ocial services district means a city or county social services district as constituted by section sixty-one."

**5.** Section 116 provides that the county commissioner is to be appointed by the county board of supervisors thereof, except when the county has a county executive, county president, county manager or other officer or board authorized to appoint heads of administrative departments or the chief executive officer of the social services department, then by the executive, president, manager, other officer or board. N.Y. SOCIAL SERVICES LAW § 116 (McKinney Supp.1998).

Section 111–b provides that the organizational unit within the state department shall be responsible for the supervision of the activities of state and local officials relating to enforcement of support. N.Y. SOCIAL SERVICES LAW § 111–b (McKinney Supp.1998). As stated above, section 111–c indicates that the support collection unit is established by the county SSD, however, section 111–b gives the state department[6] supervision over any activities of the county officials relating to the support collection unit. Thus, the second factor weighs in favor of immunity since the governing members of the collection support unit are representatives of the county but are supervised by the state.

The third factor, how the entity is funded, weighs against immunity. Section 111–d sets out that the county is responsible for fifty percent of the expenditures relating to the support collection unit after first deducting any federal funding. N.Y. SOCIAL SERVICES LAW § 111–d (McKinney Supp.1998). This factor supports the Debtors because it is unknown how much federal funding the support collection unit receives, thus the JCDSS and Farmer have not met their burden of proof on the issue. In addition, in the case law previously discussed, the Second Circuit denied immunity in the *Holley* case when twenty-five percent of the funding was from the state but granted immunity in the *Marbley* case when one hundred percent of the funding came from the state. In the case at hand, the most the state could be responsible for is fifty percent of the total expenditures. Though there is not cut off point discernible from the case law as to how much state funding is required to consider the entity an arm of the state, the JCDSS and Farmer do not advance any legal argument regarding a 50% state funding factor and thus fail to carry their burden of proof on this argument.

**6.** Section 11 states that the chief executive and administrative officer of the state department shall be the commissioner of social services who is appointed by the governor with

The fourth factor, whether the entity's function is traditionally one of local or state government is inconclusive on the issue of immunity. As previously discussed, according to the language of sections 111–c and 111–h, the support collection unit is established by the county SSD. N.Y. SOCIAL SERVICES LAW §§ 111–c and 111–h (McKinney Supp.1998). It is to be run by the county, by county officials, in accordance with state regulations, and under state supervision. With this information alone, it is impossible for the court to come to a conclusion on whether support collection is traditionally a county or a state function. Since the JCDSS and Farmer offered no proof in regard to the fourth *Feeney* factor, they fail to sustain their burden on this factor as well.

The fifth factor, whether the state has veto power over the entity's actions, weighs against immunity. The relevant portions of section 20(2) state that the state department shall:

(b) supervise all social services work, as the same may be administered by any local unit of government and the social services officials thereof within the state, advise them in performance of their official duties and regulate the financial assistance granted by the state in connection with said work.

N.Y. SOCIAL SERVICES LAW § 20(2)(b) (McKinney Supp.1998). Subsection (3) goes on to say the state department is authorized:

(a) to supervise local social services departments and in exercising such supervision the department shall approve or disapprove rules, regulations and procedures made by local social services officials within thirty days after filing of same with the commissioner.

N.Y. SOCIAL SERVICES LAW § 20(3)(a) (McKinney Supp.1998). Also, subsection (3) authorizes the state department:

the advice and consent of the senate. N.Y. SOCIAL SERVICES LAW § 11 (McKinney Supp. 1998).

(e) to withhold or deny state reimbursement, in whole or in part, from or to any social services district or any city or town thereof, in the event of the failure of either of them to comply with law, rules or regulations of the department relating to public assistance and care or the administration thereof;

(f) to promulgate any regulations the commissioner determines are necessary, in accordance with the provisions of section one hundred eleven-b of this chapter, and to withhold or deny state reimbursement, in whole or in part, from or to any social services district, in the event of the failure of any such district to comply with such regulations relating to such district's organization, administration, management or program.

N.Y. SOCIAL SERVICES LAW § 20(3) (McKinney Supp.1998).

What these sections of the statute create is not a veto power over the county's actions but a power to deny the county reimbursement. Under the SSL, the means which the state department has to assure that the county districts conform to the state department's regulations is the power to withhold reimbursement. As persuasive as this power may be, it is not an absolute veto power which the state department holds over the county's actions. The statute only provides for disapproval of rules, regulations, and procedures that the local social services officials may implement, and the withholding of reimbursement for failure to comply with law, rules or regulations of the state department. N.Y. SOCIAL SERVICES LAW § 20(3)(a), (e) (McKinney Supp.1998). The court finds no section of the SSL which allows the state department to veto a decision of the county such as the one at issue here, just provisions for withholding reimbursement. Other than the sections of the SSL, the JCDSS and Farmer have submitted no proof on the fifth factor and consequently have failed to meet their burden of proof in regard to that factor.

■ Finally, the sixth factor, whether the entity's obligations are binding on the state, weighs against immunity. "[A] judgment against a county department of social services or its commissioner in his official capacity does not bind the state and is not automatically payable out of state funds." *Holley v. Lavine,* 464 F.Supp. 718 (W.D.N.Y.1979), *aff'd,* 605 F.2d 638 (2d Cir.1979) (citing *Toia v. Regan,* 54 A.D.2d 46, 387 N.Y.S.2d 309 (N.Y.App.Div.4th Dept.1976)). The sections described above also indicate that the obligations of the JCDSS Support Collection Unit are not necessarily binding on the state. In fact, as stated earlier, section 20(3) of the statute reveals that the state department may withhold or deny reimbursement to the county for a failure to comply with rules and regulations of the state department.

The legislative scheme of the relevant sections of the SSL in this case is very similar to that in *Holley v. Lavine,* 464 F.Supp. 718 (W.D.N.Y.1979), *aff'd,* 605 F.2d 638 (2d Cir.1979). Under the legislative scheme of the Social Services Law, "county governments have an obligation to finance public assistance payments even if higher levels of government refuse to reimburse the county." *Id.* at 724. "Although in most cases state and federal funding is available for reimbursement, there is no clear rule requiring the state to indemnify the counties for judgments entered against them." *Id.* The JCDSS and Farmer have failed to prove that the obligations of the Jefferson County Support Collection Unit are binding on the state.

Because the six *Feeney* factors point in opposite directions, the court must determine whether allowing the entity to be sued in federal court will threaten the integrity of the state and whether it will expose the state treasury to risk. *Mancuso,* 86 F.3d at 293. As discussed above, the state treasury would be minimally affected, if at all, by a judgment against the JCDSS and Farmer. Therefore, the sole question to be determined is whether a suit against them in federal court will

threaten the integrity of the state. Since the entity which is subject to the suit here is the Support Collection Unit established by the JCDSS, the integrity of the state will not be affected. Even though the Support Collection Unit is to be run in accordance with the regulations of the state department and funded in part by the state department, it is still established by the county and associated with the county. In fact, it is the Jefferson County Attorney who represents them in this case. The court finds that subjecting the JCDSS and Farmer to suit in federal court for the violation of a court order would not affront the dignity of New York State. The state has not direct involvement in the defense of this motion and any finding of contempt would be directed at the Support Collection Unit of the JCDSS and its employee Amy Farmer. The integrity of the state would not be affected.

In summary, other than citing sections of the Social Services statute, JCDSS and Farmer have submitted no relevant law to support an "arm of the state" analysis in their favor. It is not evident from the statute alone that JCDSS or Farmer should be considered an arm of the state under the standards discussed above. Section 111–d explains that the county is to be responsible for a share of the expenditures incurred pursuant to section 111–h. The county SSD's are responsible for fifty percent of the amount expended by the state department, after deducting any federal funding it receives. The JCDSS and Farmer submitted no proof as to the percentage of the expenditures that would be covered by federal funding, virtually no proof that could be used in an analysis of the *Feeney* factors and no relevant case law on the issue. Thus, the court finds that they have failed to meet their burden of proving they are immune from suit under the Eleventh Amendment.

■ With regard to Defendant Amy Farmer, the court finds that she is not immune from suit under the Eleventh Amendment for the reasons set forth above. Because Farmer's actions are not considered those of the state, the arguments set forth regarding the *Seminole* decision are not applicable. Farmer also argues that she was exercising the power granted to her under section 111–t of the Social Services Law and doing so under direction of her superiors, specifically the Jefferson County Attorney. (JCDSS and Farmer's Supp.Mem. of Law at 6–8.) The court will consider this an argument invoking the doctrine of respondeat superior. Under the doctrine of respondeat superior, "[I]n the absence of any negligent behavior by an employer, liability for acts of an employee may generally be imposed upon the employer ... if the employee was acting within the scope of his employment." *Cornell v. State of New York,* 46 N.Y.2d 1032, 1033, 416 N.Y.S.2d 542, 389 N.E.2d 1064 (1979).

■ Farmer was clearly acting in accordance with the direction of her superiors and within the scope of her employment under SSL section 111–t. According to Farmer's affidavit, on June 25, 1998, she was told by the Assistant County Attorney's Office that she could levy the Debtors' milk checks. (Farmer Aff. ¶ 11.) Narang's affidavit also states that she authorized Farmer to garnish the Debtors' milk checks. (Narang Aff. ¶ 7.) Therefore, any liability resulting from the actions of Farmer in relation to this proceeding would shift to the Support Collection Unit and the JCDSS.

Having concluded that no Eleventh Amendment immunity is applicable, the court turns to the underlying facts of the instant controversy.

■ As stated *supra* at 862, the collection of alimony, maintenance, or support from non-estate property is not stayed by 11 U.S.C. § 362. Property of the estate is defined by 11 U.S.C. § 541(a) which specifically enumerates seven subsections of interests, all of which is estate property regardless of who holds it or where it is located.

In a Chapter 12, 11 U.S.C. § 1207(a) specifically includes as property of the estate:

(1) all property of the kind specified in such section that the debtor acquires after the commencement of the case but before the case is closed, dismissed, or converted to a case under chapter 7 of this title, whichever occurs first; and (2) earnings from services performed by the debtor after the commencement of the case but before the case is closed, dismissed, or converted to a case under chapter 7 of this title, whichever occurs first.

However, 11 U.S.C. § 1227(b) states:

Except as otherwise provided in the plan or the order confirming the plan, the confirmation of a plan vests all of the property of the estate in the debtor.

On July 14, 1997, this court signed the Confirmation Order in this Debtors' case. Paragraph 9 of said Order provides:

All of the Debtor(s) wage and property of whatever nature and kind and wherever located, shall remain under the exclusive jurisdiction of this Court; and title to all of the debtor's property of whatever nature and kind, and wherever located is hereby vested in the Debtor during the pendency of these Chapter 12 proceedings pursuant to the provision of 11 U.S.C. § 1227 except to the extent necessary for the Court to continue to exercise its jurisdiction.

Thus by the explicit terms of the Order, title to the Debtors' property revested in the Debtors as of confirmation "except to the extent necessary for the court to continue to exercise its jurisdiction." This court interprets that provision as reducing property of the estate to "property and future earnings of the debtor dedicated to fulfillment of the chapter 13 plan." *Security Bank of Marshalltown v. Neiman*, 1 F.3d 687 (8th Cir.1993).

As explained by the Hon. Keith M. Lundin in his Chapter 13 treatise: [7]

The vesting of property of the estate in the debtor at confirmation under § 1327(b) may have the most undesirable effect for debtors of dissolving the automatic stay of actions against the property vesting in the debtor. Section 362(c)(1) provides that "the stay of an act against property of the estate under subsection (a) of this section continues until such property is no longer property of the estate." At confirmation, § 1327(b) appears to have precisely the effect contemplated in § 362(c)(1). Debtors who fail to "provide otherwise" in the plan invite the possibility of disintegration of the chapter 13 estate at confirmation and a Pandora's box of possible postconfirmation problems.

2 KEITH M. LUNDIN, CHAPTER 13 BANKRUPTCY (2nd ed., Wiley Law Publications 1994), § 6.16 at 6–56, 6–57 (footnotes omitted).

Regarding the matrimonial exception found in 11 U.S.C. § 362(b)(2), Judge Lundin states:

The precise wording of the plan may be important when the debtor is subject to alimony, maintenance, or support obligations. There is an exception to the automatic stay in § 362(b)(2) that allows the collection of alimony, maintenance, or support "from property that is not property of the estate." Absent a contrary provision in the plan or order of confirmation, a Chapter 13 debtor's postpetition wages (at least those in excess of the amount committed to fund the plan) revest in the debtor at confirmation under § 1327(b). If the wages revested in the debtor are no longer "property of the estate," a former spouse could collect alimony, maintenance, or support from those wages, probably without first seeking relief from the automatic stay. To protect against this outcome, the Chapter 13 plan should very specifically continue the estate, to include all postconfirmation wages of the debtor—those commit-

---

7. The provisions of § 1327(b) mirror those of § 1227(b).

ted to funding the plan and those to be received by the debtor—pending completion of payments under the plan.

*Id.* at 6–57, 6–58 (footnotes omitted).

As Judge Lundin indicates, a Chapter 13 plan should very specifically continue the estate pending completion of the plan. Such a plan provision is also specifically authorized by 11 U.S.C. § 1222(b)(10) which provides that the Chapter 12 plan may "provide for the vesting of property of the estate, on confirmation of the plan or at a later time, in the debtor or in any other entity." For example, the standard Chapter 13 confirmation order utilized in this court revests property in the debtor upon "completion of the plan." [8]

■ In this case, in the words of § 362(2)(B), the JCDSS was engaged in the "collection of alimony, maintenance, or support from property that is not property of the estate" because of paragraph 9 of the July 14, 1997 Confirmation Order. Thus, no violation of § 362 occurred if JCDSS's levy reached only those earnings of the Debtors not dedicated to fulfillment of the Plan, in effect, earnings not necessary for submission to the trustee. The record is unclear whether JCDSS's levy extended that far. If the parties cannot or will not stipulate to the facts necessary for a determination of this issue within fifteen (15) days of the date of this order, the court will schedule an evidentiary hearing.

The second prong of the Debtors' motion is an allegation that JCDSS has violated court orders and should be found in contempt. Specifically, Point V of the Debtors' brief states: "In this case, the Respondent [sic] has also violated two (2) prior orders of this court: the prior restraining order resulting for [sic] the debtors [sic] motion and the order of confirmation." (Debtors' Brief in Support of Mot., November 3, 1998 at 19.)

8. 11 U.S.C. § 1322(b)(9) mimics § 1222(b)(10).

9. From the affidavits, briefs and arguments of counsel, the court cannot discern any measur-

### THE APRIL 17, 1997 ORDER

■ The court assumes that the "prior restraining order" refers to this court's Order of April 17, 1997, directing that all income levies cease effective March 27, 1997. However, because of the specific language of paragraph 9 of the Confirmation Order, the April 17, 1997 Order was effectively amended by the Confirmation Order and the provisions of § 1227(b) and § 362(b)(2)(B). By operation of black letter law, an income levy could commence postconfirmation to collect support from non-estate property. JCDSS could, if otherwise proper under state law, reach the earnings of the Debtors not dedicated to the fulfillment of the Plan. As was the problem with the alleged § 362 violation *supra*, it is unclear whether the JCDSS's levy extended to sacrosanct earnings necessary for plan fulfillment.[9] If the parties cannot or will not stipulate to the facts necessary for a determination of this issue within fifteen (15) days of the date of this order, the court will schedule an evidentiary hearing.

### THE JULY 14, 1997 CONFIRMATION ORDER

11 U.S.C. § 1227(a) provides with certain exceptions not relevant here:

> . . . the provisions of a confirmed plan bind . . . each creditor, . . . whether or not the claim of such creditor, . . . is provided for by the plan, and whether or not such creditor, . . . has objected to, has accepted, or has rejected the plan.

Paragraph 11(e) of the Confirmation Order provides that the prepetition arrears owed to Wendy Boice would be disbursed by the trustee through the Plan as a priority claim.

able violation of the April 17, 1997 Order between its issuance and the entry of the July 14, 1997 Confirmation Order. The problem then, if any, is found postconfirmation.

Section 1222(a)(2) provides that the plan shall—

(2) provide for the full payment, in deferred cash payments, of all claims entitled to priority under section 507 of this title, unless the holder of a particular claim agrees to a different treatment of such claim.

The 1994 amendments to the Bankruptcy Code amended § 507 to include as a priority claim: "debts to a spouse, former spouse, or child of the debtor, for alimony to, maintenance for, or support of such spouse or child...." 11 U.S.C. § 507(a)(7). Through this amendment, Congress has announced its intent to allow bankruptcy courts to include payment of child support obligations in Chapter 13 plans. *In re Camacho,* 211 B.R. 744 (Bankr.D.Nev. 1997). Therefore, child support arrears can be properly included in a Chapter 12 plan as well. Thus, the holders of support claims are "creditors" bound by the confirmed plan under § 1327(a) [10] just as are other creditors. 2 KEITH M. LUNDIN, CHAPTER 13 BANKRUPTCY, *supra,* § 6.10 at 6–15 (footnotes omitted).

It is conceded by JCDSS that an execution was issued against the Debtors' earnings for support arrears. The amended affidavit of Charu Narang states, "On July 30, 1998, I was informed that Jeffrey Durant's account was charging for arrears, as well as current support. I immediately authorized Mr. Schofield to stop the collection of arrears on this account." (Narang Am.Aff. at 2, ¶ 11.)

It is clear then that JCDSS, for whatever reason, followed its own course in pursuing the alleged arrears. By doing so, the terms of the Confirmation Order were violated. Pursuant to Bankruptcy Rule 9020(a), the JCDSS is in contempt of the Confirmation Order of July 14, 1997. There is, of course, the question of damages, if any, flowing from JCDSS's contempt. If the parties cannot or will not settle the matter within fifteen (15) days of this order, an evidentiary hearing will be scheduled to explore the issue of damages.

In summary, the court finds:

1) JCDSS is not immune from the consequences, if any, of violating this court's orders;

2) There is no person liability flowing to Amy Farmer;

3) Issues of fact must be explored regarding any violation of 11 U.S.C. § 362 and or this court's Order of April 17, 1997; and

4) JCDSS is in violation of this court's July 14, 1997 Order confirming the Debtors' Chapter 12 Plan. The court will issue a separate order of contempt pursuant to Bankruptcy Rule 9020(a). If not settled, an evidentiary hearing will be scheduled to determine damages.

It is so ORDERED.

---

10. The creditor provisions of § 1327(a) mirror those of § 1227(a).